# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICTOF TEXAS
### LAREDO DIVISION

| | | |
|---|---|---|
| **DAVID GILLESPIE,** | § | |
| **Individually and on Behalf of all Others** | § | |
| **Similarly Situated,** | § | **CIVIL ACTION NO. _____** |
| | § | |
| *Plaintiffs,* | § | |
| **v.** | § | |
| | § | |
| **EQUINOR TEXAS ONSHORE** | § | |
| **PROPERTIES, LLC,** | § | |
| **EQUINOR PIPELINES, LLC,** | § | **JURY TRIAL DEMANDED** |
| **EQUINOR USA ONSHORE** | § | |
| **PROPERTIES, INC., and** | § | |
| **EQUINOR US OPERATIONS, LLC,** | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT

David Gillespie, by and through his undersigned counsel, on behalf of himself and all others similarly situated (hereinafter also "Plaintiffs"), allege facts and claims upon his personal knowledge as to matters relating to himself, and upon information and belief as to all other matters based upon the investigation of counsel, as follows:

## I. INTRODUCTION

1.    This action is brought to remedy the systemic breach of contract by Equinor Texas Onshore Properties LLC (f/k/a StatOil Texas Onshore Properties, LLC), Equinor Pipelines LLC (f/k/a StatOil Pipelines, LLC), Equinor USA Onshore Properties Inc.(f/k/a Statoil USA Onshore Properties, Inc.), and Equinor US Operations LLC (f/k/a StatOil Gulf Services, LLC) (hereinafter collectively "Equinor" and/or Defendants) in connection with Equinor's use of an improper methodology to calculate and pay Plaintiff and Class Members contractually-owed oil and gas royalties.  In 2010, Talisman Energy USA, Inc., now known as Repsol Oil & Gas USA, LLC

1

("Talisman") and Equinor USA Onshore Properties Inc. entered a joint development agreement to own and produce oil and gas from multiple wells and leases across the Eagle Ford, Texas area. Under the joint development agreement, Equinor and Talisman divided the oil and gas production on a roughly 50-50 basis. Equinor and Talisman sold their own shares of production and each paid royalty owners for their share of the production sold.

2.     Starting in 2009, the Eagle Ford saw a remarkable rise in new rigs and new production.[1] Effective August of 2013, Equinor assumed the position of authorized operator for wells in the eastern area of operations which covered principally Karnes, DeWitt and Bee counties. Effective April of 2016, Equinor assumed the position of authorized operator for all joint wells in all Eagle Ford areas.

3.     Equinor lacked adequate "condensate" production data and/or other data, and therefore improperly calculated payments due Plaintiff and Class Members. Much of the Eagle Ford shale production is light and unstable "condensate," which must be stabilized before the product is marketable. "Condensate" refers to a lighter grade of crude oil, often produced in conjunction with wells that produce large amounts of natural gas. Stabilization requires treatment, usually in the form of heating and pressurization, to remove the volatile and lighter elements— principally methane and other natural-gas liquids. These lighter elements, known as "flash gas," can be collected and reintroduced back into the natural gas stream for subsequent processing and sale. Many times, removal of "flash gas" results in 30% or more of the initial condensate volume measured at the well separator to shrink into the final stabilized volume suitable for sale. Equinor and its joint venturer, Talisman, constructed over a dozen different batteries or central

---

[1] *See* https://www.eia.gov/petroleum/drilling/pdf/eagleford.pdf

facilities sometimes referred to as Central Delivery Points ("CDP's") or Central Receipt Points ("CRP's") to perform this necessary processing.

4.     Initial processing occurs at the separator near the well where the raw stream is split into water, oil, condensate, and gas.  The oil/condensate and gas are measured at a meter installed at the tail-end of the separator.  Additional processing occurs between this point of measurement and measurement at the point of sale.  Between that processing and natural evaporation of condensate/oil, there is typically a reduced volume measured at the sales meter, with the difference referred to as "shrinkage."   Because the final measurement point is at the sales meter, the accounting function must proportionally allocate production back to the wells for the purpose of properly calculating royalty.  In many cases, 20%, 30%, or more of the initial condensate volume is shrunk as a result of treatment.

5.     Equinor's lack of a proper methodology (due to a lack of condensate production data) resulted in both it and Talisman improperly calculating payments due royalty owners including, *inter alia*, Plaintiff Gillespie and Class Members.  Additionally, upon information and belief, Equinor's methodology did not obtain the appropriate price for the product, and permitted Equinor to take expense deductions that were not proper.

## II. PARTIES

6.     Plaintiff David Gillespie is a citizen of Texas and resident of Bexar County, Texas.  Mr. Gillespie owns lease interests entitling him to royalty payments on the actual oil and gas produced from wells operated by Equinor and/or Talisman.  Plaintiff Gillespie and Class Members entered into oil and gas lease agreements with Equinor and/or Talisman for the development, production, and sale of oil and gas in Texas. *See Gillespie Lease Attached as Exhibit A.* Since that time, Plaintiff Gillespie and Class Members have been underpaid royalties as a result of the improper

payment methodology employed by Equinor, its failure to obtain the appropriate price for the product, and its improper expense deductions.

7.    Equinor Texas Onshore Properties LLC ("Equinor Texas"), upon information and belief, is and has been at all times material and relevant herein, a for-profit corporation organized and existing under the laws of the State of Delaware with its principle place of business in Houston, Texas.  Defendant Equinor Texas Onshore Properties LLC may be served with process through its registered agent, Capital Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, Texas 78701.  Plaintiffs have requested a waiver of summons from this Defendant.

8.    Equinor Pipelines LLC ("Equinor Pipelines"), upon information and belief, is and has been at all times material and relevant herein, a for-profit corporation organized and existing under the laws of the State of Delaware with its principle place of business in Wilmington, Delaware and/or Stamford, Connecticut, conducting business in Texas.   Defendant Equinor Pipelines LLC may be served with process through its registered agent, Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.  Plaintiffs have requested a waiver of summons from this Defendant.

9.    Equinor USA Onshore Properties Inc. ("Equinor USA"), upon information and belief, is and has been at all times material and relevant herein, a for-profit corporation organized and existing under the laws of the State of Delaware with its principle place of business in Houston, Texas. Defendant, Equinor USA Onshore Properties Inc may be served with process through its registered agent, Corporation Service Company at 211 E. 7th St. Austin, Texas 78701. Plaintiffs have requested a waiver of summons from this Defendant.

10.    Equinor US Operations LLC ("Equinor Operations"), upon information and belief, is and has been at all times material and relevant herein, a Delaware limited liability corporation with its

principle place of business in Stamford, CT conducting business in Texas. Defendant Equinor US Operations LLC may be served with process through its registered agent, Corporation Service Company, as reflected in the Texas Secretary of State records, at 211 E. 7th Street, Suite 620 Austin, Texas 78701-3218. Plaintiffs have requested a waiver of summons from this Defendant.

### III. JURISDICTION

11. This Court has jurisdiction over Plaintiffs' claims pursuant to Title 28 U.S.C. §1332(d). Diversity jurisdiction exists and Plaintiffs reside in Texas. The Class consists of citizens and residents having oil and gas rights for property including leases involving the Equinor defendants. The amount in controversy exceeds $5,000,000.00 for Representative Plaintiff and members of the Class collectively, exclusive of interests and costs, by virtue of the amount of royalties Equinor failed to pay pursuant to its contractual obligations, and by virtue of the declaratory relief sought. Plaintiffs Gillespie and members of the Class collectively have oil and gas rights for property including leases involving the Talisman and/or Equinor defendants. This court has personal jurisdiction, both specific and general, over Defendants because they are doing business in Texas. Moreover, Defendants committed acts and/or omissions within the State of Texas, including directed their activities within the State of Texas such that they can reasonably anticipate being haled into Texas courts. Additionally, one or more Defendants are essentially at home in the State of Texas. Texas courts' assertion of jurisdiction over these Defendants does not offend the notions of fair play and substantial justice, and Defendants could reasonably anticipate being haled into Texas court. Defendants have systematic and continuous contacts within the State of Texas and, moreover, the specific acts and/or omissions at issue in this lawsuit occurred within the State of Texas.

## IV. VENUE

12.    Venue is proper in the Southern District of Texas, Laredo Division, where Plaintiff's wells at issue are located, where material acts occurred, and where certain of Class Members own royalty rights to wells and reside.  Venue is proper in this district pursuant to Title 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this federal district.

## V. FACTS

13.    Plaintiff and Class Members own royalty rights and interests arising from oil and gas leases in the South Texas Eagle Ford shale play ("Eagle Ford"). Equinor was established as a wholly-state-owned oil company in 1972.  Reform in 1985 made it possible to consider the ownership structure of Equinor and apply for public listing.  This reform marked the start of a process leading up to the public listing of Equinor in 2001.  Norsk Hydro ASA ("Hydro") was founded in 1905 as a private company.  Hydro-electric development at the beginning of the 20th century laid the basis for industrial growth in Norway and for Hydro's business concept, which was the production of nitrogen fertilizer.  Hydro entered the oil and gas industry in 1963, and in October of 2007, merged with Equinor.  Today, Equinor is a Norwegian-based energy company with operations in more than thirty (30) countries.

14.    Talisman is an upstream oil and gas production company and an indirect subsidiary of Calgary, Alberta-based Talisman Energy Inc. ("TEI") which was acquired for approximately $13 billion by an affiliate of the Spanish integrated energy company Repsol S.A. on May 8, 2015. In 2010, Talisman and Equinor entered a joint development agreement to own and produce oil and gas from multiple wells and leases across the Eagle Ford, Texas area.  Under the joint-development agreement, Equinor and Talisman divided the oil and gas production on a roughly

50-50 basis. Equinor actually identifies the Eagle Ford play on its website.  Equinor and Talisman sold their own shares of production and each paid royalty owners for their share of the production sold.   By entering into a joint venture, Equinor became jointly and severally liable for payments made to royalty owners.

15.     In Texas, gas and oil leases permit royalty payments to be calculated based on the amount of gas or oil as determined either at the wellhead or the amount that enters the pipeline for sale, and may be based on production of oil and gas, or sales of the produced oil and gas.

16.     The production of oil, condensate and natural gas at a well site is measured daily at the wellhead by a meter.

17.     Pursuant to Texas oil and gas law, the operating entity is responsible for reporting all required well production data to Texas Comptroller of Public Accounts (hereinafter "Texas Comptroller").  Title 16, TEX. NAT. RES. CODE.   Reports to the Texas Comptroller include both volumes sold and revenues received, by product reported.

18.     Texas law also requires that any entity paying oil and gas royalties must accompany the payment with a check stub from the payor containing details, inter alia, of well identification, volume of production, price, decimal interest (the royalty owner's share of production from the drilling unit), expense deductions and taxes. TEX. NAT. RES. CODE §§91.501-91.502. The required check stub detail is intended to allow the royalty recipient to verify that the payment accords with the payor's obligation under applicable leases.

19.     In 2010, Talisman entered the Texas oil and gas market and opened a Texas office whereby it acquired extraction rights under numerous oil and gas leases in the Eagle Ford shale including those owned by Plaintiff and the and Class Members. Talisman also entered into the South Texas Joint Development Agreement (the "Development Agreement"), which created a joint venture

between Talisman and Equinor to explore, develop and produce oil and gas. Equinor also owns extraction rights under numerous oil and gas leases in the Eagle Ford.

20.     The Development Agreement obligated the well operator, including Equinor, to report all well-production data to the non-operating partner in a manner consistent with and as required by the Texas Comptroller, so that both the operator and non-operating partner could comply with Texas law governing royalty payments, expenses, adjustments and deductions thereto and documentation including check stubs to mineral rights owners.

21.     Under the Development Agreement, Equinor and Talisman agreed to divide the oil and gas production on a 50-50 basis.   Equinor and Talisman sell their own share of the production, are required to properly report their half of the volumes to royalty owners, and must properly pay royalty owners.

22.     Plaintiff Gillespie and Class Members are owners of the royalty rights for oil and gas leases in Eagle Ford that establish their rights to properly calculated royalty payments. The Development Agreement did not change Plaintiffs' rights to proper royalty payments.

23.     Initially, Talisman acted as operator for all of the Eagle Ford joint venture acreage, with Equinor retaining a non-operating, working interest. While the operator of record, Equinor and/or Talisman were responsible for accurately reporting the oil and gas production to the Texas Railroad Commission and state Comptroller.

24.     While the operator and/or joint venture partner with Equinor, Talisman began in late 2012 to commingle the gross production of oil, condensate and gas from various wells of differing ownership, including Plaintiff's and Class Members' wells, using extensive gathering and treatment facilities referred to as Central Gathering Points, Central Deliver Points and/or Central Receipt Points.

25.    Equinor's joint venturer, Talisman, has admitted that when it entered the Texas oil and gas market, it did not have the capability to manage the complexities of the leases it was purchasing and entering into and its production accounting system was incapable of proper allocation of commingled oil and gas production and sales.

26.    Effective July 1, 2013, Equinor and Talisman modified their Joint Development Agreement so as to divide responsibility for drilling and operating wells in the joint venture acreage, including those in which Plaintiff and Class Members owned royalty interests.

27.    According to the Joint Development Agreement modification effective July 1, 2013, Talisman continued operating wells within the western and central portion of the shared holdings, and Equinor agreed to operate the wells in the eastern portion of the shared acreage.  However, Talisman continues to market its own share of production and maintain a revenue accounting function to account for the revenues received from sales of production and allocate revenues back to each owner on a per-well basis.

28.    In December of 2015, Equinor and Talisman further amended the Joint Development Agreement to provide that Equinor now serves as operator for all wells within the joint venture acreage, with Talisman retaining a non-operating working interest.

29.    Unbeknownst to Plaintiff and Class Members, Equinor and Talisman's joint decision to commingle gross oil and gas production from wells of differing ownership interest created certain challenges when allocating the commingled sales of those production volumes back to the individual wells. Texas law requires that a "commingler" identify each royalty owner's aliquot share of production commingled and sold with reasonable certainty.  Equinor and its joint venturer, Talisman, did not properly allocate these commingled sales of those production volumes.

30.     In addition to their commingling and allocation problems, Equinor and Talisman jointly reduced the measured volumes of gas and oil by an across-the-board skim (the "Skim").  Equinor and Talisman used gross production volumes of condensate reduced by as much as 30% to estimate net sales of condensate then improperly allocated those volumes back to the individual wells before improperly paying royalty owners, like Plaintiff and Class Members, on the improperly shrunken volumes.

31.     The issues with joint venturer Equinor's and Talisman's commingling, allocating and shrinking were not clear to or discoverable by Plaintiff or royalty owners including Class Members. While the Joint Development Agreement required Equinor and Talisman to share production and pay royalties  on a 50-50 basis, the information and format of Talisman's check stubs were different from the information  and format of Equinor's check stubs  and  for production and production adjustments during different  time  periods  than  those reflected on check stubs, it was difficult, if not impossible,  for Plaintiff and Class Members to determine the net difference, let alone the reason for the net difference,  in royalty  payments.

32.     Equinor's joint venturer, Talisman, has admitted to reducing Plaintiff and Class Members' royalty payments based on "shrinkage."  Talisman has also admitted that if it could not justify its lower  production  volume, so both  Equinor and Talisman, via joint  venture, would be legally responsible to make  additional royalty payments to royalty owners pursuant to their respective lease agreements.

33.     In response to royalty owner's questions regarding the difference in the royalty payments between Talisman and Equinor, Talisman explained away the Skim by contending that in

transporting and marketing oil, certain volumes of condensate (light oil) do not qualify for royalty payments because they are lost to "shrinkage."

34.    In the oil and gas industry, shrinkage refers to the difference between production amounts produced at the wellhead entering a pipeline for sale.  Shrinkage attributable to a given well is not a static percentage.  There is no domestic oil industry standard or common practice which allows for application   of a fixed shrinkage factor to estimate sales.   Moreover, based upon information and belief, Equinor's joint venturer, Talisman's own personnel, concluded shrinkage, if applicable, could never approach the 20% Skim, and certainly never 30%.

35.    Any reduction of royalty payments under a mineral rights lease must be permitted and justified, either from actual measurement or established American domestic oil industry standards. Plaintiff and Class Members' lease provisions require  joint venturers, Equinor and Talisman, to pay on actual sales not estimated, commingled, allocated, shrunken or calculated net sales volumes as done here.

36.    Regardless whether the production volume is measured  at the well head, after separation, or at the point of sale, under no circumstances do the applicable leases permit the afore-mentioned Skim.

37.    In employing the Skim for the purpose of shorting royalty payments to Plaintiff and Class Members, Equinor and its joint venturer Talisman engaged in actions that were arbitrary, capricious, and in bad faith.

38.    Equinor and its joint venturer Talisman have also arbitrarily manipulated production volumes and royalty payments from joint-venture wells operated by Talisman and reported shrunken and improperly allocated net sales volumes to the Texas Railroad Commission and

State Comptroller.  Upon information and belief, Equinor used a pricing methodology that systematically underpaid Plaintiff and Class Members, and systematically took expense deductions that were not proper, for which Plaintiff further brings this cause.

39.    Complaints were made about the discrepancies between royalty checks from Equinor and Talisman, but only misleading explanations were provided.

## VI. EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

40.    Equinor and its joint venturer Talisman arbitrarily and unilaterally manipulated royalty owner payments by estimating sales volumes through the shrinking of gross production volumes and improperly allocating commingled production and net sales volumes.

41.    Equinor and its joint venturer Talisman intentionally concealed the actions herein described in the forgoing paragraphs to ensure the continuation of those activities and forestall legal action.

42.    Without access to the Joint Development Agreement, well production, run sheets and gauge reports, and Equinor's and Talisman's sale and distribution agreements, Plaintiff and Class Members would be both unable to determine the extent and nature of Equinor's and its joint venturer Talisman's wrongful conduct or the financial harm suffered because of such conduct. None of these documents critical to exposing Equinor's and its joint venturer Talisman's wrongful conduct were given to and Class Members. Thus, Plaintiff and Class Members was left with inadequate information. Moreover, Equinor and Talisman did not simply disclose its commingling, allocating and estimating to Plaintiff and Class Members. Moreover, Equinor and Talisman concealed or obfuscated such information such that neither Plaintiff nor Class Members could reasonably ascertain the issues discussed herein.

43.    By its very nature, Equinor's and its joint venturer Talisman's activity, as alleged herein, was self-concealing. Plaintiff and Class Members had no knowledge of Equinor's and its joint venturer Talisman's deceitful conduct and could not have discovered same by the exercise of due diligence.

44.    As a result of Equinor's and its joint venturer Talisman's fraudulent concealment of its conduct, and the self- concealing nature of their acts, Plaintiff and Class Members assert the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiff and Class Members.

45.    Equinor is equitably estopped from asserting that any otherwise applicable limitations period has run.

## VII. THE DISCOVERY RULE

46.    Plaintiff and Class Members did not discover, nor should Plaintiff and Class Member have reasonably discovered, Equinor's and its joint venturer Talisman's wrongful conduct causing their injuries until recently, prior to the filing of this complaint.

47.    Plaintiff and Class Members did not discover, nor should Plaintiff and Class Members reasonably have discovered, (1) the injuries and (2) the identity of the person(s) whose wrongful conduct caused the injuries, until recently, prior to the filing of this complaint.

48.    The discovery rule applies to toll the statute of limitations as to all causes of action against Equinor and its joint venturer Talisman, and other responsible parties identified by discovery in this matter.

## VIII. CLASS ACTION ALLEGATIONS

49.    This action asserts claims on behalf of a class pursuant to Federal Rules of Civil Procedure 23(a), (b)(l), (b)(2), (b)(3), and (c)(4) as follows:

> All persons who, pursuant to an oil and gas lease within the Texas, Eagle Ford Shale, received between January 1, 2010 and June 29, 2018 royalty payments from Equinor and/or its joint venturer Talisman attributable to production, including but not limited to, gas, oil, condensate and all hydrocarbons separated, extracted or manufactured from gas that was commingled with production from one or more other wells, and to whom Equinor and/or its joint venturer Talisman paid such royalties using a volumetric allocation methodology of net production sold and/or estimated "shrunk" production volumes.

50.    Excluded from the Class are (i) Equinor and its employees, principals, affiliated entities, legal representatives, successors and assigns; (ii) all governmental entities, including, federal, state, and local governments and their respective agencies, departments, or instrumentalities; (iii) owners of any interests and/or leases located on or within any federal created units; (iv) owners of any non-operating working interest for which Equinor or its agents, representatives, as operator, disburses royalty; (v) the judges to whom this action is assigned, any members of their immediate families, (vi) and any clerk or staff assigned to those judges.

51.    There are thousands of potential members of the Class who are geographically dispersed throughout the United States. Therefore, individual joinder of all members of the Class would be impractical.

52.    There is a well-defined community of interest in the questions of law and fact affecting the parties represented in this action.

53.    Common questions of law or fact exist as to all members of the Class. These questions predominate over the questions affecting only individual Class members. The predominate legal and factual questions in this case include, but are not limited to:

      a.    Whether the Skim Scheme methodology was applied to Plaintiff and all Class Members alike, and whether that Skim Scheme's methodology reduced royalty payments due Plaintiff and all Class Members.

b.      Whether Equinor and/or its joint venturer Talisman voluntarily commingled the gross oil and gas production of multiple wells with differing ownership interests;

c.      Whether Equinor and/or its joint venturer Talisman can identify with reasonable certainty each royalty owner's aliquot share of gross production and resulting net sales;

d.      Whether Equinor and/or its joint venturer Talisman improperly allocated net sales back to the individual wells in violation of industry standards and common practice:

e.      Whether Equinor and/or its joint venturer Talisman used an industry accepted standard or practice when they estimated nets sales of condensate by use of a common methodology to arbitrarily reduce production volumes of oil and gas;

f.      Whether Equinor's and/or its joint venturer Talisman's application of 20%-30% Skim in calculating royalties to Class Members was justified, either from actual measurement or established American domestic oil industry standards;

g.      Whether Equinor and/or its joint venturer Talisman breached the materially similar lease provisions of Plaintiff and Class Member regarding the volumes for which royalty payments are made;

h.      Whether the commingling, allocating and arbitrary shrinking of production volumes of oil and gas resulted in reduced royalty payments to Plaintiff and Class Members;

i.      Whether Equinor and/or its joint venturer Talisman disclosed, accounted for and reported correctly to Plaintiff and Class Members the volumes of oil and gas production on which it owed royalties;

j.      Whether Equinor's and/or its joint venturer Talisman's commingling gross production, allocating net sales and use of the Skim violated its duties to Plaintiff and Class Members to honestly account for and pay royalties;

k.      Whether the check stubs furnished by Equinor and/or its joint venture Talisman with royalty payments complied with Texas law;

l.      Whether Equinor used a systematic methodology of pricing and expense deduction that improperly reduced royalty amounts due Plaintiffs and Class Members; and

> m.   The appropriate measure of damages, penalties, interest, equitable and/or declaratory relief.

54.   The Skim Scheme methodology applied to Plaintiff and all Class Members alike.  The Skim Scheme's calculation is one of a simple methodology that applies an across-the-board number to Plaintiff and all Class Members.  Under well settled law, variances in the amount of damages of individual class members do not preclude class certification.

55.   Plaintiff's claims are typical claims of the Class in that Plaintiff has materially similar lease agreements as other members of the class entitling them to royalty payments from the gross production volume sold. Plaintiff's claims are also not subject to any unique defenses. Therefore, there are no significant differences in any relevant respect from any other Class member, and the relief sought is common to the Class.

56.   Plaintiff is an adequate representative of the Class because he has no interests adverse to or in conflict with members of the Class he seeks to represent, and he has retained counsel competent and experienced in conducting complex class action litigation, and litigation regarding the rights of mineral owners. Plaintiff and his counsel will adequately protect the interests of the Class.

57.   Equinor and its joint venturer Talisman have engaged in a pattern of misconduct common to the entire Class so that class-wide relief is appropriate.

58.   The common pattern of Equinor's and joint venturer Talisman's misconduct and the common theories for redressing that misconduct make a class action superior to other available methods for fairly and efficiently adjudicating the underlying dispute.  The damages suffered by each individual Class Member on balance are relatively small, while the burden and monetary expense needed to individually prosecute this case against Equinor is substantial. Thus, it would

be virtually impossible for Class Members individually to redress effectively the wrongs done to them. Moreover, even if Class Members could afford individual actions, a multitude of such individual actions still would not be preferable to class-wide litigation.

59.    By contrast, a class action presents far fewer litigation management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive  supervision by a single court.   The class is readily definable and prosecution   as a class action will eliminate the possibility of repetitious litigation while also providing redress for those claims that may be too small to warrant the expenses of individual, complex litigation.  Also, or in the alternative, the Class may be certified because Equinor has acted or refused to act on grounds generally applicable to the Class, thereby making preliminary and final declaratory relief appropriate.

60.    In addition, the  maintenance of separate actions would place a  substantial and unnecessary burden on the courts  and could result  in inconsistent  adjudications,  which  would be dispositive  of at least some of the issues and hence interests  of the other members  not party to the individual  actions,  would substantially  impair or impede  their ability to protect their interests, and would establish  incompatible  standards of conduct  for the party opposing the Class. A class action can determine  the legality of Defendants' actions relative to all class members with judicial economy.

61.    Further, in the alternative, the Class may be maintained as a class action with respect to particular issues pursuant to FED.R.CIV.P. 23(c)(4).  Additionally, if necessary, the Class may be maintained through sub-classes.

62.    All records concerning each of the leases, volumes of gas and oil production, and royalty payments from Equinor are in the possession and control of Equinor and its agents and are available through discovery.

## IX. CLAIMS

### COUNT 1
### BREACH OF CONTRACT

63.    Plaintiff and Class Members incorporate by reference all preceding paragraphs.

64.    Plaintiff and Class Members executed valid and enforceable contracts in the form of oil and gas leases, directly or through assignments, with Equinor.

65.    Plaintiff and Class Members, as parties to the lease and assignments and/or royalty owners, are the proper parties to enforce the terms of the relevant leases and assignments and have performed, or have substantially  performed, all necessary conditions precedent, dependent obligations, and/or dependent covenants owed under the relevant leases and assignments.

66.    Pursuant to the materially similar lease terms, Equinor promised to make royalty payments based on the actual production volume of gas and oil sold.

67.    Plaintiff and Class Members have been entitled to Equinor's performance of its obligations under the relevant leases and assignments to make royalty payments based on the actual production volume of gas and oil sold.

68.    Equinor materially breached the gas and oil leases applicable to Plaintiff and Class Members by paying royalty owners based on estimated production volumes sold as a result of Equinor improperly allocating net sales from commingled production and applying the Skim to gross production volumes and thereby reducing the royalty payments owed to Plaintiff and Class Members.

69.    Equinor has refused and continues to refuse to perform its obligations to pay Plaintiff and Class Members royalty payments based on the actual production volumes of gas and oil sold as required by the applicable lease agreements.

70.    As of the filing of this Complaint Equinor has not tendered the amounts owed to Plaintiff and Class Members.

71.    Defendants have materially breached its contractual obligations to Plaintiff and Class Members, including the express terms set out above in the Facts. Examples of such breaches include but are not limited to the following:

    a.    Through the Skim Scheme, reducing production volumes of oil, or liquid or liquefiable hydrocarbons and/or natural gas produced from the relevant lands by approximately 20% - 30% without notice or contract support under the existing oil and gas lease contracts;

    b.    Failing to pay the agreed royalty payments for oil or liquid or liquefiable hydrocarbons produced and sold from the relevant lands as provided for in their oil and gas lease;

    c.    Failing to pay royalties on all oil, condensate and gas produced and sold from the relevant lands as provided for in their oil and gas lease;

    d.    Using a systematic methodology of pricing and expense deduction that improperly reduced royalty amounts due Plaintiff and Class Members; and

    e.    Refusing to provide Plaintiff, among other materials, relevant and related records and data pertaining to the production, transportation, sale, and marketing of the production from the relevant lands.

72.    As a direct and proximate cause of Equinor's contractual breaches, Plaintiff and Class Members have been damaged for which they are entitled to recover actual damages, general damages, special damages, nominal damages, consequential damages, interest, penalties, attorneys' fees, and any other legal or equitable relief deemed appropriate by the Court.

**COUNT 2**
**ACCOUNTING**

73.    Plaintiff and Class Members incorporate by reference all preceding paragraphs.

74.    Damages alone will not compensate Plaintiff and Class Members for their collective loss of royalty payments consistent with their oil and gas lease contracts.  The facts and accounts presented are so complex that adequate relief may not be obtained at law. Standard discovery procedures, such as requests for production, interrogatories, and subpoenas *duces tecum,* may prove inadequate to provide Plaintiff and Class Members with the information sought regarding royalty payments.

75.    Plaintiff and Class Members seeks an accounting pursuant to the information required under Texas Natural Resources Code Section 91, *et seq.* as follows:

    a.    For past and present monthly production volumes of oil, liquids, condensate, liquefied hydrocarbons and natural gas by well for Plaintiff and Class Members as reported to the Texas Comptroller or other state or federal agency, to royalty owners by Equinor, as recorded by any third-party vendor contracted by Equinor to test, sample or record such volumes;

    b.    For past and present royalty payments made to Plaintiff and Class Members on the production of oil, liquids, condensate, liquefied hydrocarbons and natural gas production volumes, and substances;

    c.    For past and present deductions by category of expense or other deductions including but not limited to deductions for "shrinkage," and for past and present information supporting any deduction or expense from or to production volumes or royalty payments; and

    d.    For past and pricing methodology used to calculate Plaintiff and Class Members' royalty payments.

**COUNT 3**
**FRAUD AND NEGLIGENT MISREPRESENTATION**

76.    Plaintiff and Class Members incorporate by reference all preceding paragraphs.

77.    Defendants made material, false representations to Plaintiff and Class Members including, *inter alia,* representations regarding Plaintiff's and Class Members' royalties, pricing, expense

deductions, and other misrepresentations found, *inter alia*, on their check stubs, correspondence, and/or other sources generated or provided by Defendants.

78.    When Defendants made these and other representations, Defendants (a) knew the representations were false, or (b) made the representations recklessly, as a positive assertion, and without knowledge of its truth.

79.    Defendants made these representations with the intent Plaintiff and Class Members act on them.

80.    Plaintiff and Class Members relied on these representations, and the representations caused Plaintiff and Class Members injury and/or damage.

81.    Plaintiff and Class Members bring fraud causes of action against Defendants including, *inter alia*, common-law fraud, fraud by nondisclosure, and statutory fraud pursuant to Texas law.

82.    Defendants' representations outlined herein further constitute negligent misrepresentation.

83.    Defendants' acts or omissions outlined herein were a proximate or producing cause of Plaintiff's and Class Members' injuries or damages.

## COUNT 4
## UNJUST ENRICHMENT

84.    Plaintiff and Class Members incorporate by reference all preceding paragraphs.

85.    Equinor has been unjustly enriched because of the Skim Scheme, commingling, improperly allocating, shrinking and underpayment of royalties owed to Plaintiff and Class Members as described herein.

86.    Plaintiff and Class Members, in justice and fairness, are entitled to restitution of all underpayments of royalties caused by such wrongful acts and omissions which unjustly enriched Equinor, recovery of reasonable attorneys' fees, recovery of statutory penalties and interest as

provided at TEX.NAT.RES. CODE §§91.401 ~ 91.404, punitive damages and any and all other equitable relief deemed appropriate by the court.

## COUNT 5
## DECLARATORY JUDGMENT

87.    Plaintiff and Class Members incorporate by reference all preceding paragraphs.

88.    Plaintiff and Class Members are entitled to a declaratory judgment: (a) declaring Equinor liable to Plaintiff and Class Members for the wrongful acts, omissions, practices, and schemes described above, (b) ordering Equinor to provide complete and accurate check stub information, as required by TEX.NAT.RES. CODE §91.502, (c) determining the correct calculation of Plaintiff and Class Members' royalties under the applicable lease(s), (d) determining the correct pricing methodology generally applicable to Plaintiff and Class Members, (e) determining the correct expense deduction to make to Plaintiff and Class Members' royalty calculation, and (f) granting Plaintiff and Class Members such other or additional declaratory and/or injunctive relief relating to such wrongful acts, omissions, practices, and financial/accounting schemes as may be available under the law and deemed appropriate by the Court, and/or (d) awarding attorneys' fees as provided for by contract or pursuant to TEX.NAT.RES. CODE §91.406, and TEX.CIV.PRAC. & REM. CODE 38.001 *et seq.*

## X. REQUEST FOR RELIEF AND PRAYER

89.    WHEREFORE, Plaintiff, on behalf of himself and on behalf of all other Class Members, requests an award and relief as follows:

> a.    An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiff be appointed Class Representative, and undersigned counsel be appointed Class Counsel;

> b.    A determination that Equinor breached obligations owed Plaintiff and Class Members;

c.    A declaration and Order providing the other declaratory and injunctive relief requested throughout this Complaint;

d.    An Order requiring Equinor to provide an accounting of past and present royalty payments for Plaintiff and Class Members;

e.    Actual, general, special, nominal and consequential damages in an amount to be determined at trial;

f.    Applicable statutory penalties for Claims for which they are available;

g.    Punitive damages for Claims for which they are available;

h.    Equitable and/or declaratory relief for Claims for which they are available, including, *inter alia*, such relief outlined above in paragraph eighty-eight (88);

i.    An order awarding Plaintiffs their costs of suit, including reasonable attorneys' fees and pre-and post-judgment interest at the highest rate allowed by law;

j.    An order declaring that Equinor is financially responsible for notifying all Class Members of this action; and

k.    Such other and further relief as may be deemed necessary or appropriate.

## XI. DEMAND FOR JURY TRIAL

Plaintiff and Class Members hereby demand a trial by jury on all issues so triable.

Respectfully Submitted,

**THE FERGUSON LAW FIRM, LLP**

350 Pine Street, Suite 1440
Beaumont, Texas 77701
Tel: 409.832.9700
Fax: 409.832.9708

By: **/s/ Jane S. Leger**
        Jane S. Leger State Bar
State Bar No. 00788814
jleger@thefergusonlawfirm.com

By: **/s/ Paul "Chip" Ferguson**

23

Paul "Chip" Ferguson State
State Bar No. 06919200
cferguson@thefergusonlawfirm.com

By: **/s/ Mark C. Sparks**
Mark C. Sparks
State Bar No. 24000273
mark@thefergusonlawfirm.com

 AND

By: **/s/ Layne Walker**
Layne Walker
State Bar No. 20713900
Walkerlaw3@gmail.com